**Teresa AMBROSINI, et al., Appellants,**

**v.**

**Jorge LABARRAQUE and The Upjohn Company, Appellees.**

No. 95–7270.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1996.

Decided Dec. 6, 1996.

Court's denial of Crespin's Rule 60(b) motion was an abuse of discretion.

Barry J. Nace, Washington, DC, argued the cause for appellants, with whom Kenneth J. Chesebro, Cambridge, MA, was on the briefs.

George E. Berry, pro hac vice, argued the cause, for appellees. David M. Covey, Allen M. Hecht, New York City, and Roger W. Heald, Washington, DC, were on the brief. Michael F. Flynn, Jr. and Katherine S. Duyer, Rockville, MD, entered appearances.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

Dissenting opinion filed by Circuit Judge HENDERSON.

ROGERS, Circuit Judge:

This case appears before this court for the second time after the district court granted summary judgment to appellees, Dr. Jorge Labarraque and the Upjohn Company. Again, we address only the question of the admissibility, not the weight, of the Ambrosinis' expert evidence. The district court initially ruled that the Ambrosinis had failed to present admissible scientific evidence sufficient to create a genuine issue of material fact as to whether the drug Depo–Provera caused the birth defects suffered by Teresa Ambrosini, the daughter of Mr. and Mrs. Ambrosini. This court reversed summary judgment and remanded the case to afford the district court the opportunity to determine whether the opinions expressed by the Ambrosinis' medical experts had an adequate legal foundation to render them admissible under Federal Rule of Evidence 703. *Ambrosini v. Labarraque*, 966 F.2d 1464, 1469 (D.C.Cir.1992) ("*Ambrosini I*"). Following the remand, the district court again granted summary judgment to appellees.

The Ambrosinis contend that the district court erred in refusing to accept at "face value" Dr. Allen S. Goldman's uncontroverted testimony that his conclusion concerning specific causation was based upon a valid scientific methodology. They also contend that the district court's ruling was contrary to *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1535 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), in that appellees' expert used the same diagnostic methodology as Dr. Goldman and differed only in his conclusion as to causation. We conclude that while the district court properly could review the expert's methodology as part of its "gatekeeping" function, *Daubert v. Merrell Dow,* 509 U.S. 579, 597, 113 S.Ct. 2786, 2798–99, 125 L.Ed.2d 469 (1993), its failure ultimately to distinguish between the threshold question of admissibility and the persuasive weight to be assigned the expert evidence requires reversal and remand.

## I.

Teresa Ambrosini was born on October 23, 1967, with severe birth defects, including facial and ear malformations, hearing loss due to middle ear abnormalities, eye and vertebral malformations, and cleft lip and palate. In 1984, Teresa and her parents sued the manufacturers of the drugs Bendectin and Depo–Provera claiming that the drugs, either individually or in combination, caused Teresa's birth defects. The Ambrosinis also named as a defendant Mrs. Ambrosini's physician, Dr. Labarraque, who prescribed the drugs for Mrs. Ambrosini during her pregnancy. The claims against the manufacturer of Bendectin were dismissed in 1989, leaving only the prescribing physician and the Upjohn Company as defendants.[1]

Upjohn moved for summary judgment on the ground that no reliable scientific evidence existed to support the contention that Depo–Provera caused Teresa's birth defects. In support of its motion, Upjohn submitted the affidavit of Dr. Joe Leigh Simpson, who discussed three epidemiological studies, as well as other published articles and studies, all indicating that medroxyprogesterone (the generic name for Depo–Provera) did not cause the type of birth defects suffered by Teresa Ambrosini. In response, the Ambrosinis

1. For ease of reference, we refer hereinafter to appellees as Upjohn.

submitted the affidavits of an epidemiologist and a teratologist.[2] In his affidavit, Dr. Brian Leslie Strom stated that after a review of the available epidemiological data, it was his opinion within a reasonable degree of medical certainty, that Depo–Provera is a teratogen that causes birth defects. Dr. Goldman's affidavit stated that it was his opinion to a reasonable degree of medical certainty that Depo–Provera causes the types of birth defects with which Teresa was born, and that her birth defects were a result of the administration of Depo–Provera to her mother. Neither identified specifically the publications, studies, or methodology that formed the basis of his opinion. Upon reviewing the affidavits alone, the district court found the experts' opinions "conclusory and unsupported," noting that their conclusions were contrary to those published in relevant peer-reviewed scientific journals, and that Dr. Strom, who the court found had "reinterpreted" the available epidemiological data, had neither published his interpretation nor subjected it to peer review. Relying on its assessment of the affidavits as well as *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823 (D.C.Cir.1988), *cert. denied,* 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989), the court granted summary judgment for Upjohn.

In reversing the grant of summary judgment, this court explained that Federal Rule of Evidence 705 "eliminates the prior practice of requiring an expert to set out, specifically, the facts and data underlying an opinion before allowing the expert to testify." *Ambrosini I,* 966 F.2d at 1468–69. The court remanded the case, holding that because the district court had not conducted a sufficient inquiry into the bases of the Ambrosinis' experts' opinions, summary judgment was premature. *Id.* at 1469. Noting that Federal Rule of Evidence 703 "broadens the acceptable bases for expert testimony by allowing an expert to base an opinion on hearsay and other evidence not admissible in court," *id.* at 1466, the court observed that "[a] court must know the basis for an expert's opinion before it can determine that

the basis is not of a type reasonably relied on by experts in the field." *Id.* at 1469. The court stated that Rule 703 limits judicial inquiry into the basis for the expert's opinion, as distinct from the expert's conclusion. " 'As long as the basic methodology employed to reach such a conclusion is sound, [the] law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical.' " *Id.* at 1467 (quoting *Ferebee,* 736 F.2d at 1536).

On remand, the district court issued orders to show cause requiring the Ambrosinis' experts to produce the articles and other data that formed the basis of their opinions, and then held an evidentiary hearing. Thereafter, the district court ruled that the testimony of Dr. Goldman was inadmissible under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that the testimony of Dr. Brian Leslie Strom, even if admissible, was insufficient to create a genuine issue of material fact because it did not address whether the drug had caused Teresa's birth defects.

## II.

Our review of the grant of summary judgment is *de novo. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Summary judgment should be granted only when, viewing the evidence in the light most favorable to the non-movant, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson,* 477 U.S. at 250, 255, 106 S.Ct. at 2511, 2513–14; *Tao,* 27 F.3d at 638. The court noted in the first appeal, moreover, that "[w]hen a court denies the right to have a jury decide a disputed issue, especially one of a scientific nature, its reasons for doing so must be strong." *Ambrosini I,* 966 F.2d at 1469.

---

2. Whereas an epidemiologist studies the distribution and determinants of disease in populations, a teratologist studies abnormal development and congenital malformations in animals and human beings.

Federal Rule of Evidence 702 provides that "[i]f scientific ... knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify ... in the form of an opinion or otherwise." [3] Rule 703 explains that if "[t]he facts or data in the particular case upon which an expert bases an opinion or inference" are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." [4] Following our remand in *Ambrosini I*, the Supreme Court decided *Daubert*. In that case, the Supreme Court instructed that rigid adherence to the requirement announced in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), that expert testimony be based on methods "generally accept[ed]" in the relevant scientific community, "would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'" *Daubert*, 509 U.S. at 588, 113 S.Ct. at 2794 (citations omitted). In instructing that *Frye's* "general acceptance" test had been superseded by the adoption of the Federal Rules of Evidence,[5] and in particular, Rule 702, the Supreme Court announced a new standard in *Daubert*. 509 U.S. at 588, 113 S.Ct. at 2794.

■ The *Daubert* standard involves a two-prong analysis that centers on evidentiary reliability and relevancy: the district court must determine first whether the expert's testimony is based on "scientific knowledge;" and second, whether the testimony "will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. at 2796. Performing a "gatekeeping" role, the district court must engage in "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. at 2796. As "gatekeeper," the *Daubert* Court instructed, the district court must focus "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. at 2797.[6]

■ Under the first prong of the analysis, the district court's focus is on the methodology or reasoning employed. " '[S]cientific' implies a grounding in the methods and procedures of science," and " 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* at 590, 113 S.Ct. at 2795. Ruling out any requirement that scientific testimony must be " 'known' to a certainty," *id.*, the Supreme Court concluded that:

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Id.*

■ The Court discussed four factors that the district court may consider in evaluating

---

**3.** Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

**4.** Federal Rule of Evidence 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

**5.** Federal Rule of Evidence 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

**6.** *See also Joiner v. General Electric Co.*, 78 F.3d 524, 529 (11th Cir.1996), *petition for cert. filed*, 65 U.S.L.W. 3110 (U.S. Aug. 5, 1996) (No. 96–188) ("Trial judges must evaluate scientific processes and studies with which they may not be intimately familiar, but be careful not to cross the line between deciding whether the expert's testimony is based on 'scientifically valid principles' and deciding upon the correctness of the expert's conclusions.").

scientific validity. *Id.* at 593–94, 113 S.Ct. at 2796–97. They are: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community. *Id.* The Court emphasized, however, that the inquiry is a "flexible one," and that none of the factors discussed is necessarily applicable in every case or dispositive; nor are the four factors exhaustive. *Id.* at 593–95, 113 S.Ct. at 2796–98. With respect to peer review and publication, for example, the Court noted that "[s]ome propositions ... are too particular, too new, or of too limited interest to be published." *Id.* As will become clear upon examining the Ambrosinis' experts' testimony, *see* Part III, *infra,* the four factors offer limited assistance here for reasons acknowledged by the Supreme Court in *Daubert*: the proposition at issue is highly particular and has not attracted significant scientific scrutiny because, in accord with the position of the Federal Drug Administration ("F.D.A."), Depo–Provera is no longer prescribed for pregnant women. *Id.* at 593, 113 S.Ct. at 2796–97.

The second prong of the *Daubert* analysis primarily concerns relevance. *Id.* at 591, 113 S.Ct. at 2795–96. The district court must determine whether the proffered expert testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (citations omitted). The *Daubert* Court described this consideration as one of "fit." *Id.* As the Court cautioned, " 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

 This court has had only one occasion to consider the *Daubert* standard. In *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 567 (D.C.Cir.1993), the court addressed the admissibility of expert testimony regarding lost wages. In concluding that the testimony was "wholly speculative," *id.* at 569, the court noted that its conclusion was unaffected by *Daubert.* Under *Daubert,* courts must still regulate the subjects and theories of expert testimony, and " 'the word "knowledge" connotes more than subjective belief or unsupported speculation.' " *Id.* at 569–70 (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795). In other words, the *Daubert* analysis does not establish a heightened threshold for the admission of expert evidence, but rather focuses on the court's "gatekeeper" role as a check on "subjective belief" and "unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. While "an inference or assertion must be derived by the scientific method," *id.,* the threshold for admissibility has been lowered, both because of the liberal theory of admissibility adopted by the Federal Rules of Evidence and because *Frye*'s "general acceptance" test is no longer dispositive of admissibility. General acceptance in the relevant scientific community may be sufficient to permit the admissibility of expert testimony, but it is no longer required.

 Even if the burden placed on the "gatekeeper" may seem heavy at times, *see, e.g., Daubert,* 509 U.S. at 600–01, 113 S.Ct. at 2800 (Rehnquist, C. J., concurring in part and dissenting in part), there is nothing in *Daubert* to suggest that judges become scientific experts, much less evaluators of the persuasiveness of an expert's conclusion. Rather, once an expert has explained his or her methodology, and has withstood cross-examination or evidence suggesting that the methodology is not derived from the scientific method, the expert's testimony, so long as it "fits" an issue in the case, is admissible under Rule 702 for the trier of fact to weigh. Recognition of the limited nature of the *Daubert* inquiry is implicit in *Joy* and similarly reflected in other circuits' post-*Daubert* decisions.[7] In light of the limited "gatekeeper"

---

7. *See, e.g., Joiner,* 78 F.3d at 530 (11th Cir. 1996) ("In analyzing the admissibility of expert testimony, it is important for trial courts to keep in mind the separate functions of judge and jury, and the intent of *Daubert* to loosen the strictures of *Frye* and make it easier to present legitimate conflicting views of experts for the jury's consideration"); *see also Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1124–25 (9th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995); *United States v. Bonds,* 12 F.3d 540, 556 (6th Cir.1993); *Porter v. Whitehall Laborato-*

role that *Daubert* envisions under the Federal Rules of Evidence, and treating *Frye*'s "general acceptance" standard, and thus this circuit's pre-*Daubert* precedent, *see Mendes–Silva v. United States*, 980 F.2d 1482 (D.C.Cir.1993); *Richardson*, 857 F.2d 823; *Ferebee*, 736 F.2d 1529, as relevant but not dispositive, we examine the expert evidence proffered by the Ambrosinis.

### III.

In response to Upjohn's motion for summary judgment, which asserted that there was no reliable scientific evidence supporting the contention that Depo–Provera causes the type of congenital defects with which Teresa was born, the Ambrosinis proffered a two-pronged response: the first, by Dr. Strom, an epidemiologist, to show that the drug could cause birth defects like Teresa's; the second, by Dr. Goldman, a teratologist, to show that the drug, in his opinion, had caused Teresa's birth defects. So understood, the Ambrosinis presented experts on both general and specific causation to meet their burden to defeat summary judgment. *See Mendes–Silva*, 980 F.2d at 1487.

### A.

Dr. Strom, the epidemiologist, offered testimony addressing the general causal link between Depo–Provera and the type of birth defects with which Teresa was born. Without addressing the first prong of the *Daubert* analysis, the reliability of Dr. Strom's methodology, the district court ruled that his testimony was inadmissible because it did not meet the second prong, the relevancy or "fitness" of the testimony. In conducting the relevance inquiry, the district court adopted a standard articulated by the Ninth Circuit

on remand from the Supreme Court's decision in *Daubert*. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1321 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) (*Daubert II*) (applying California tort law). [8] Because Dr. Strom "offer[ed] no testimony as to the relative risk between exposed and unexposed populations of cleft lip and palate or any other of the birth defects from which [Teresa] suffers," the district court concluded that Dr. Strom's opinion that Depo–Provera *can* cause the type of birth defects from which Teresa suffers, "[did] not adequately 'fit' [the Ambrosinis'] burden of proof." Thus, while not ruling Dr. Strom's testimony to be *per se* inadmissible, the court held it inadmissible because it failed the *Daubert* relevancy test. The district court further ruled that, even if admissible, Dr. Strom's testimony in itself would have been insufficient to create a genuine issue of material fact necessary to defeat summary judgment.

Under *Daubert*, Dr. Strom's evidence does not warrant exclusion simply because it fails to establish the causal link to a specified degree of probability. The fitness prong of the *Daubert* admissibility inquiry primarily concerns relevance. The dispositive question is whether the testimony will " 'assist the trier of fact to understand the evidence or to determine a fact in issue,' " *Daubert*, 509 U.S. at 591, 113 S.Ct. at 2795 (quoting Federal Rules of Evidence 702), not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial. Contrary to the district court's conclusion, Dr. Strom's testimony that medroxyprogesterone (the generic name for Depo–Provera) is capable of causing the types of defects suffered by Teresa relates to a contested issue and

---

*ries, Inc.*, 9 F.3d 607, 613 (7th Cir.1993); *United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993), *cert. denied*, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994) (instructing that the district court must determine not only whether the expert's proffered methodology or principle is scientifically valid, but whether the expert actually applied the methodology or principle in the particular case).

8. Under the Ninth Circuit's standard, a plaintiff must offer either specific evidence that the drug actually caused their injuries or epidemio-

logical proof that the drug "more than doubles" the risk of birth defects because epidemiological evidence presents statistical likelihoods rather than direct information about the cause of birth defects for the particular plaintiff. *Id.* at 1320–21. In light of our disposition, we have no occasion to consider whether the substantive tort law of California and the District of Columbia are similar and need not decide whether to adopt the Ninth Circuit's analysis in *Daubert II* when causation is to be established solely by the testimony of an epidemiologist.

could aid the jury's resolution of the Ambrosinis' claims. *Daubert,* 509 U.S. at 591, 113 S.Ct. at 2795–96. That Dr. Strom's testimony alone may be insufficient for the Ambrosinis to survive summary judgment does not necessarily defeat its admissibility under the "fitness" prong of *Daubert.* Because Dr. Strom's testimony is "sufficiently tied" to the facts at issue, we conclude that it satisfies *Daubert*'s fitness prong.

Dr. Strom's testimony also survives the first stage of *Daubert* scrutiny, which requires that the expert evidence constitute scientific knowledge. 509 U.S. at 591, 113 S.Ct. at 2795–96. Testifying that his conclusions were premised on conventional epidemiological methods, Dr. Strom first set forth the reasoning he employed that led him to disagree with those studies finding no causal relationship between progestins and birth defects like Teresa's. He explained that an epidemiologist evaluates studies based on their "statistical power." Statistical power, he continued, represents the ability of a study, based on its sample size, to detect a causal relationship. Conventionally, in order to be considered meaningful, negative studies, that is, those which allege the absence of a causal relationship, must have at least an 80 to 90 percent chance of detecting a causal link if such a link exists; otherwise, the studies cannot be considered conclusive. Based on sample sizes too small to be reliable, the negative studies at issue, Dr. Strom explained, lacked sufficient statistical power to be considered conclusive.

Dr. Strom proceeded to explain how he arrived at his opinion that a positive causal connection exists between Depo–Provera and the type of birth defects suffered by Teresa. Emphasizing that epidemiologists evaluate the "totality of the data," Dr. Strom stated that he "conducted [an] extensive search of the entire medical literature in terms of the epidemiology of the link between progestins and birth defects, reviewed every paper that is relevant to this in the medical literature, and applied absolutely. conventional epidemi-

ological methods and criteria to draw conclusions of causation." In order to determine epidemiologic causation, he explained, the epidemiologist first determines whether there is an "association" between two phenomena, that is, "whether there is a statistically significant finding at greater than 95 percent chance that it's not due to random error." Upon finding an association, he continued, epidemiologists then apply specific criteria to determine whether that association is causal. Dr. Strom recited and explained these criteria, which include consistency in the findings of multiple scientific studies, biologic plausibility, the time sequence of the prospective cause and effect, the quantitative strength of the association, and the specificity with which the two phenomenon correlate. After finding an association between Depo–Provera and the types of birth defects suffered by Teresa, Dr. Strom stated that he also found consistency among the relevant scientific studies, with the exception of those negative studies which he discounted as too small to be significant, and biological plausibility. Dr. Strom testified that he did not recalculate data from other studies,[9] and there is no evidence in the record that suggests that his methodology was unconventional or improper in his field.

While publication in a peer-reviewed journal is not dispositive in evaluating whether an opinion is based on scientific knowledge, *Daubert,* 509 U.S. at 594, 113 S.Ct. at 2797, Dr. Strom persuasively explained the reasons why he had not published his findings. First, he stated that there was nothing novel in his work on this subject, and that he simply employed an "absolutely conventional approach to reviewing a very detailed literature." Second, he explained that there would be "no reason in the world" to publish his findings because Depo–Provera is no longer prescribed during pregnancy. The F.D.A., Dr. Strom stated, prohibits Provera from being used in pregnancy "because of known effects on offspring when exposed in

---

9. Dr. Strom clarified that to the degree that the author of a study did the calculation, he preferred and used the author's calculations. Only when the author presented data on a question, but did not present the relevant calculations, did Dr. Strom do them himself. Never did he recalculate the author's own calculations on an issue.

utero." [10] This second rationale is one of the factors contemplated by the Supreme Court in *Daubert* when it suggested that courts should bear in mind that some scientifically valid studies may not be published because of "too limited interest." 509 U.S. at 593, 113 S.Ct. at 2797.

### B.

The district court also ruled inadmissible Dr. Goldman's testimony that, within a reasonable degree of medical certainty, Depo–Provera can and did in fact cause Teresa's birth defects. While noting that Dr. Goldman's testimony passed the relevance prong of the *Daubert* test, the district court concluded that it failed to qualify as scientific knowledge. The district court essentially found fault with Dr. Goldman's testimony for two reasons. First, as to general causation, the court took issue with Dr. Goldman's conclusion that Depo–Provera can cause birth defects. Reviewing the studies presented by Upjohn that suggest the absence of a causal relationship, the court stated that Dr. Goldman "has never specified the basis for his disagreement." While Dr. Goldman rejects the negative studies showing no causal relationship, the court continued, he offered no basis for his conclusion that causation did in fact exist. The court also faulted him for founding his conclusion on a balancing-of-the-competing-arguments methodology, an approach the court concluded was not based on scientific knowledge. Second, as to specific causation, the court emphasized that Dr. Goldman failed to elaborate the methodology he used to move from the conclusion that Depo–Provera can cause birth defects to the conclusion that Depo–Provera actually caused Teresa's birth defects. With regard to excluding other potential causes, the court stated, "Dr. Goldman gave no recitation of steps he took, other than reviewing Teresa Ambrosini's medical records, to ensure that

no other factors may have caused [her] birth defects."

The district court mischaracterized Dr. Goldman's testimony on general causation when it stated that the only description of his methodology was that he reviewed data and then performed a balancing analysis. In reaching this conclusion, the court "relied heavily on an isolated comment" about balancing rather than, as this circuit requires, "a fair reading of [Dr. Goldman's] entire [statement]." *Mendes–Silva*, 980 F.2d at 1487. The record reveals that Dr. Goldman specifically identified the animal, pharmacological, and human studies that he relied on to reach the opinion that Depo–Provera caused Teresa's type of birth defects. While he acknowledged that none of the studies specifically concluded that Depo–Provera caused the type of birth defects suffered by Teresa, he explained that, by following the traditional methodology of experts in his field, after considering all the data and evidence, he arrived at the conclusion that Depo–Provera can cause birth defects like Teresa's. Upon considering the range of defects that the studies did find, Dr. Goldman concluded that all together there was sufficient data to conclude that progestins produced a significant malformation rate. When questioned about a table in a chapter he wrote for the book, *Pediatric Pharmacology*, Dr. Goldman explained that the table, which did not describe any correlation between estrogen-progestin drugs and craniofacial deformities, was intended only to illustrate the effect of timing on the causal relationship between drugs and malformations, not to provide an exhaustive list of teratogenic drugs and the malformations that they may cause.

 Under the relevant precedent in this circuit, Dr. Goldman's testimony is ad-

---

10. In originally granting summary judgment, the district court stated that it gave "significant weight" to the view expressed by the F.D.A. in 1989 that there is no causal relationship between progestational agents and non-urogenital defects, and that previously required package label warnings about possible congenital heart defects and limb reduction defects were no longer necessary.

53 Fed.Reg. 1243 (Jan. 12, 1989). However, both Drs. Strom and Goldman testified, and it was undisputed by Upjohn, that before 1989 the F.D.A. had placed Depo–Provera in category X, a classification of drugs that are prohibited from use during pregnancy because of known effects on offspring exposed in utero.

**138**

missible as scientific knowledge.[11] In *Ferebee*, 736 F.2d 1529, the court considered the admissibility of expert testimony in a products liability action involving a chemical. The court explained that "a cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his [or her] opinion, such a relationship exists." *Id.* at 1536. The court noted that "products liability law does not preclude recovery until a 'statistically significant' number of people have been injured," and that the fact "that science would require more evidence before conclusively considering the causation question resolved is irrelevant." *Id.* Thus, when experts are "concededly well qualified in their fields," the fact that a case may be the first of its type, or that the plaintiff's doctors may have been the first "alert enough" to recognize a causal connection, should not preclude admissibility of the experts' testimony. *Id.* In addition, the court held in *Mendes–Silva,* that "[w]hen the underlying basis or methods of an expert's opinion are of a type reasonably relied upon by the experts in the field, the court must allow the opinion to be assessed by the factfinder—even if the opinion reaches a novel conclusion." 980 F.2d at 1485. Even where a party has admitted that no biochemical or epidemiological test has been done that can conclusively establish a link between a drug and an illness, their expert evidence on the subject is not rendered inadmissible. *Id.* at 1486.

It is true that the expert evidence offered by Dr. Goldman in the instant case bears some resemblance to that proffered in *Richardson,* 857 F.2d at 832, which held inadmissible expert testimony alleging causation of a drug in a birth defects case. But the factual distinctions between the two cases, as well as the reasoning adopted in *Richardson* and explained in *Mendes–Silva,* are significant and support admissibility here. *See Richardson,* 857 F.2d 823. First, Dr. Goldman never conceded that his methodology was not generally accepted in his field, a point that the *Ambrosini I* court suggested was dispositive in *Richardson. Ambrosini I,* 966 F.2d at 1469. Dr. Goldman testified repeatedly that he employed a generally accepted methodology, a contention confirmed in an article from *Teratology,* a peer-reviewed journal that was presented to the district court.[12] The article's enumeration of the methodologies generally followed by teratologists, including a list of the types of data that teratologists consult and an explanation that teratologists weigh all of the data to determine the risk of an individual compound, supports the soundness of Dr. Goldman's approach.

Second, unlike in *Richardson,* there is no "overwhelming body of contradictory epidemiological evidence" to Dr. Goldman's conclusion. 857 F.2d at 830. While some studies suggest no causal relationship between Depo–Provera and the types of birth defects suffered by Teresa, others suggest a positive one. In *Richardson* the court pointed out that the issues before it had been the subject of extensive scientific research and that, "on the oft-asserted claim of causal relationship of Bendectin and birth defects, the drug has been extensively studied and a wealth of published epidemiological data has been amassed, none of which has concluded that the drug is teratogenic. *Uniquely to this case,* the law now has the benefit of twenty years of scientific study, and the published

11. The Ambrosinis' reliance on *Fireguard Sprinkler Sys. v. Scottsdale Ins. Co.,* 864 F.2d 648, 651 n. 2 (9th Cir.1988), and *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 114 (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987), for the contention that the district court was required to accept as true testimony that was not struck by Upjohn under Fed.R.Civ.P. 56(e) is misplaced. Neither case stands for more than the proposition that the failure to object to testimony when submitted waives later objections on appeal. Moreover, neither *Mendes–Silva,* 980 F.2d 1482, nor *Daubert* require the district court to point to affirmative evidence disproving an expert's methodology

in order to rule the expert's testimony inadmissible; the proponent of the expert's testimony must present more than mere conjecture. *Cf.* 509 U.S. at 597, 113 S.Ct. at 2798–99. Entrusting the district court with the role of gatekeeper, *Daubert* simply directs the district court to engage in a preliminary assessment of the scientific validity of the expert's reasoning or methodology. *Id.* at 592–93, 113 S.Ct. at 2796–97.

12. We do not suggest that an independent source was necessary to support the admissibility of Dr. Goldman's testimony.

results must be given their just due." 857 F.2d at 832 (emphasis added). The instant case is more similar to the situation in *Mendes–Silva*, where expert testimony in an area where "no conclusive epidemiological studies exist[ed]" was held admissible. 980 F.2d at 1487. Particularly because the inquiry concerning Depo–Provera and pregnant women has become moot as a result of F.D.A. action, the fact that a cause-effect relationship has not been conclusively established by animal or epidemiological studies does not render Dr. Goldman's testimony inadmissible. *See Ferebee*, 736 F.2d at 1536.

Third, unlike the doctor in *Richardson*, whose opinions were based on his own unreviewed recalculations of data gathered by others, 857 F.2d at 831, Dr. Goldman examined the relevant studies, noted their limitations, and followed a methodology accepted by teratologists to reach his conclusion. In response to studies that failed to reveal a significant risk of particular types of birth defects associated with Depo–Provera, Dr.

Goldman explained that those studies did not have enough cases of cleft lip or cleft palate to render any conclusive determination concerning the relationship between the drug and those defects.[13]

Consistent with the *Daubert* Court's instruction that the admissibility inquiry is a flexible one and may include consideration of factors beyond those discussed by the Court, *see Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97, additional indicia of reliability support the admissibility of Dr. Goldman's testimony on general causation. In the early 1980's, at the request of the F.D.A., Dr. Goldman testified at its Public Board of Inquiry that Depo–Provera causes birth defects. That Dr. Goldman testified to his opinion of general causation in a public hearing, without any connection to the Ambrosinis' litigation, reduces concerns that Dr. Goldman is simply "a gun for hire." That he was called upon by the F.D.A. to testify on causation of birth defects suggests that he is rec-

---

13. In dismissing Dr. Strom's and Dr. Goldman's opinions on general causation, the dissent misinterprets their testimony, ignoring their discussion of statistical power and the appropriateness of evaluating the totality of the data, *see infra* at 141–143. Dr. Strom and Dr. Goldman did not, as the dissent asserts, *infra* at 141–142, base their opinions largely on two independent studies by Greenberg and Matsunaga. Dr. Strom testified that he relied on those studies "among many" and that he examined the "totality of the data," not simply "a few papers." Dr. Goldman's reference to the Greenberg and Matsunaga studies was in response to a question regarding studies that had been published in a peer-reviewed journal where the authors found statistically significant increased risks for progestin alone and cleft lip and palate; he did not purport to be enumerating the most important studies or the ones on which he primarily relied. Dr. Strom testified that the Greenberg study found a "trend" between progestogens and the increased incidence of birth defects, but lacked sufficient statistical power to find a statistically significant association. Moreover, Dr. Strom conceded that the Matsunaga study concluded that the association it found between hormone therapy and birth defects could not have been causal because the hormones were administered after the defective organs had already developed; he did not, however, concede that the study concluded hormone therapy does not cause birth defects. In discussing studies by Heinonen and Newman, Dr. Goldman clarified that they did not specifically discuss cleft lip and palate because "they didn't have enough cases of cleft lip and cleft palate to say one way or the other." "But," Dr. Goldman continued, "they did have enough if they grouped the data altogether to say that . . . progestins produced a significant malformation rate in the total amount [of defects]." In like manner, contrary to the dissent's suggestion otherwise, *see infra* at 142, Dr. Strom did not concede that the Heinonen study found no association between Depo–Provera and the types of birth defects from which Teresa suffers. After noting that Heinonen found "associations between progestins in general and all defects and [an] association between progestins and congenital heart defects" and was "specifically able to identify an association between Provera and birth defects which it did not see with some of the other progestins," Dr. Strom clarified that "the fact that it didn't see an association between Provera and one specific defect" was inconclusive because "then you're getting down to such fine divisions that you're not going to have any statistical power." Similarly, in discussing Lammer's study, Dr. Strom noted that although it found no causal relationship between progestins and cleft lip or palate, it did find increased risk of other malformations. As to the review articles published by Warkany, Wilson and Brent, and Schardein, for which the authors simply reviewed the literature rather than conducting their own scientific studies, Dr. Strom noted that none were epidemiologists, and Dr. Goldman pointed out that these studies concluded "there wasn't data sufficient to establish that progestins cause nongenital defects in humans," not that there was "no evidence" of a causal relationship.

ognized in his field and that he employs scientifically valid methodologies.

Also, Dr. Goldman is an expert with significant stature and expertise in the area of birth defects. He is the current director of The Craniofacial Center at the University of Illinois College of Medicine and the former director of the section of teratology at the Children's Hospital of Philadelphia, has served on numerous occasions as a consultant to the National Institute of Health in the fields of teratology and toxicology, and has published over two hundred articles in the field. While such evidence usually goes to whether an expert has sufficient qualifications to testify, several circuits have treated it as circumstantial evidence as to whether the expert employed a scientifically valid methodology or mode of reasoning. *See Joiner*, 78 F.3d at 532 (11th Cir.); *Hopkins*, 33 F.3d at 1125 (9th Cir.); *United States v. Downing*, 753 F.2d 1224, 1239 (3d Cir.1985).

The district court also mischaracterized Dr. Goldman's testimony on specific causation. Contrary to the district court's conclusion, the record shows that Dr. Goldman did elaborate upon the methodology that he used to get from the conclusion that Depo–Provera can cause Teresa's type of birth defects to the conclusion that it did cause her defects. Dr. Goldman explained that he considered the other possible causes for Teresa's condition, including chromosomal abnormalities, genetic defects, and viruses, and by reviewing Teresa's and her mother's medical records, he ruled them out. He eliminated chromosomal abnormalities by consulting a chromosomal study of Teresa that was done in the 1970's, and ruled out a genetic defect by examining the Ambrosinis' family history, consulting the genetic literature, reviewing the general medical history and physical examinations set out in the medical records of Teresa and her mother, and by reviewing the individual malformations in this case. Dr. Goldman added that he eliminated single gene mutations as a possible cause because "there are no described gene defects that produce this." In ruling out a virus, Dr. Goldman explained that there are "about a

half dozen viruses" known to cause birth defects, and that, if a virus were responsible for defects, the mother would have had the viral disease. After consulting the mother's history, Dr. Goldman found that the clinical picture did not indicate that a virus was responsible.

Upjohn's efforts to discredit Dr. Goldman's methodology by pointing to the limits of the research he undertook into possible genetic or chromosomal causes of Teresa's birth defects—namely, that he had neither done a critical family history nor ordered a more state-of-the-art chromosomal study—goes to the weight rather than the admissibility of his testimony. In *Mendes–Silva*, where the expert testified that he had ruled out alternative non-viral causes for the plaintiff's injury by consulting the examinations and lab tests conducted on the plaintiff while she was in the hospital, this court found no fault with partial reliance on such a methodology. *Mendes–Silva*, 980 F.2d at 1487. The fact that several possible causes might remain " 'uneliminated,' " the court explained, only goes to the accuracy of the conclusion, not the soundness of the methodology. *Id.* Dr. Goldman's review of the various literatures as well as the relevant medical records and studies of Teresa and her mother constituted a sufficient foundation for the admissibility of his testimony on specific causation.

■ Under Rule 703, *Daubert* instructs that the admissibility inquiry focuses not on conclusions, but on approaches, and the record shows that both Drs. Strom and Goldman employed scientifically valid methodologies. Both doctors' testimony comfortably cleared the hurdle of admissibility established by *Daubert* and by this circuit's precedents concerning expert scientific evidence. Their conclusions were neither the "subjective belief" or "unsupported speculation" that *Daubert* and the Federal Rules would preclude a fact finder from hearing, nor the admittedly deficient expert opinions excluded by this court in *Richardson*, 857 F.2d at 830–31, and the Seventh Circuit in *Porter*, 9 F.3d at 614–15.[14] While our dissenting colleague asserts

14. In *Porter*, the excluded expert testimony was offered by a series of doctors, one of whom

admitted having no scientific support for a "curbside" opinion on causation; another admit-

that Dr. Strom and Dr. Goldman employed "wispish methodologies," *see infra* p. 145, the record does not provide a basis for this characterization. In summarily dismissing Dr. Strom's, as well as Dr. Goldman's, opinion that, despite the lack of positive studies on the specific relationship between Depo–Provera and the type of birth defects from which Teresa suffers, it is scientifically permissible to reach a conclusion of causation based on related human, animal, and pharmacological studies, our colleague simply points to studies with contrary conclusions on causation. The district court's error, by contrast, did not lie in its mischaracterization of the experts' methodologies but instead in its misconception of the limited "gatekeeper" role envisioned in *Daubert. See Joiner,* 78 F.3d at 530; see *also Mendes–Silva,* 980 F.2d at 1488. By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder. The aggregate of Dr. Strom's epidemiology testimony on general causation, that Depo–Provera can cause birth defects like Teresa's, and Dr. Goldman's teratology testimony on general and specific causation, that Depo–Provera, to a reasonable medical certainty, can and did cause Teresa's injuries, other known causes of birth defects having been ruled out, provide sufficient evidence to raise a question of material fact as to the cause of Teresa's birth defects.

Accordingly, we reverse the grant of summary judgment to Upjohn and remand the case to the district court for further proceedings.

KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that in order to be admissible in a case such

as this expert testimony must both "be 'scientific ... knowledge' " and " 'assist the trier of fact to understand the evidence or to determine a fact in issue.' " 509 U.S. at 590–91, 113 S.Ct. at 2795 (quoting Fed.R.Evid. 702). The Court explained that

in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

509 U.S. at 590, 113 S.Ct. at 2795. The Court assigned to the trial court the task of "determin[ing] at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. at 2796. The court's determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. at 2796. The district court here made such an assessment on remand. After conducting the detailed inquiry required by this court in *Ambrosini v. Labarraque,* 966 F.2d 1464, 1468– 69, 1471 (D.C.Cir.1992), the district court found both Strom's and Goldman's testimony inadmissible. And little wonder. Neither expert offered anything resembling a scientifically valid basis for his opinion that ingestion of Depo–Provera, or of progestins in general, has a causal relationship to cleft lip, cleft palate or the other birth defects Teresa Ambrosini suffered. The district court therefore properly held the experts' testimony inadmissible and this panel should affirm the court's holding.

Both Strom and Goldman purported to base their opinions largely on two indepen-

ted that he could not render an opinion on causation to a reasonable degree of medical certainty; a third conceded that his opinion was a "hypothesis, the proof of which remains to be made;" a fourth admitted that his theory of cau-

sation was based on a far greater dosage than that which the plaintiff had received; and a fifth doctor admitted that his theory of causation lay outside his field of expertise. 9 F.3d at 614–15.

dent studies conducted by Greenberg and Matsunaga. *See* App. 209, 245; 352–54, 358. Yet each conceded during the lengthy evidentiary hearing below that neither study found a significant causal link between progestins and increased incidence of cleft lip or palate. *See, e.g.,* App. 250 (Strom agreeing that when Greenberg study "looked at that issue, progestins and hormonal support, they were unable to find a statistically significant increased incidence of birth defects"); 360 (Goldman agreeing that Greenberg study "did not find a statistically significant excess of cleft lip-palate in children born to mothers who received only progestin"); 255–56 (Strom agreeing that Matsunaga study "said in fact" there was no "causal" association between hormone therapy and birth defects "because they established, to their satisfaction, that the drug was given after the defects had already occurred"); 431 (Goldman admitting that Matsunaga study "concluded that while statistically there was an increased association between Provera and cleft lip-cleft palate . . . given the importance of timing and the fact that they knew when conception had taken place, they were able to establish that the drug was given after the defects had already occurred; therefore the association was not causal").

Goldman also claimed to rely on two studies by Heinonen and Newman. App 346. But again, responding to specific questions, he conceded that neither study "found a statistically significant increased risk for Provera causing the type of birth defects that Teresa Ambrosini has," neither of "cleft lip and palate" nor of "the entire picture of what Teresa Ambrosini has." App. 347–48.[1] In fact, he ultimately conceded he was not "aware of any review article published in any peer-reviewed journal that . . . has said that

progestins do cause cleft lip-cleft palate or any of the defects that Teresa Ambrosini has," App. 404–05, and that he did not "recall" "any article . . . that shows an association between Provera or Depo–Provera and an increased incidence of cleft palate in humans," App. 420.[2]

Further, each expert acknowledged, but discounted, the existence of published studies of progestins (Lammer study) and Provera in particular (Katz study and Yovich study) that found no causal relationship between those substances and cleft lip or palate, App. 257, 259 (Strom); App. 350–51 (Goldman), and three other published studies (Warkany study, Wilson & Brent study, Schardein study) that found no evidence that progestins cause nongenital birth defects. App. 295 (Strom); App. 402–04 (Goldman).

Thus, in the end, we are left with no basis for the two experts' opinions except their own individual study. Strom testified that he formed his opinions "look[ing] at the totality of the data" in the published studies without "looking at the much larger literature of people expressing opinions in the literature." App. 260. This "methodology" produced conclusions inconsistent with those of the studies' authors but supportive of the appellants' case. Strom claimed to base his opinions on the data of the "positive" studies only, rejecting the negative studies' data as "too small," App. 266, but the two "positive" studies he identified do not support a causal relationship between Depo–Provera and any of the specific birth defects Teresa Ambrosini suffered. *See* App. 300, 293 (Heinonen study found association of progestins with "heart defects" but "didn't see an association between Provera and one specific defect"); App. 257 (Lammer study "didn't find an in-

---

1. Goldman did testify regarding the birth defects that were found in the two studies, "like cardiac defects, limb defects and several others," that the researchers "did have enough if they grouped the data all together to say that Provera—no, no—progestins produced a significant malformation rate in the total amount." App. 348–49. This "significant malformation rate" tells us nothing, however, of the relationship between progestins and cleft lip or palate, which, as the majority concedes, the studies "did not specifically discuss . . . because 'they didn't have enough cases of cleft lip and cleft palate to say one way or the

other.' " Maj. Op. at 139 n.13 (quoting Goldman at App. 348).

2. Goldman also cited a letter to the editor of the "Medical Journal of Australia" that apparently found some association between "progestogen-estrogen" combinations and cleft lip and palate. *See* App. 362–68. Goldman testified, however, that the letter was based on an "uncontrolled study" and as such "might give you some idea" but would not yield a result that is "significant statistically." App. 365.

creased incidence of cleft lip, cleft palate or any of the other malformations that Teresa Ambrosini has with respect to progestin use" but only of "other malformations"). Thus, his opinions are not, as he claimed, supported by those studies' data nor, judging from his testimony, by any "appropriate validation." *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. And Goldman's opinions fare no better.

Goldman described his methodology as follows: "[L]ike anything else, it's the preponderance of an argument. It's the argument in favor against the argument against, and this is what everyone else does." App. 429. The district court concluded: "The problem with this methodology is that it does not satisfy *Daubert.*" App. 39. I agree—as apparently does the majority. *See* Maj. Op. at 137.

The majority nevertheless attempts to defend Goldman's baseless opinion on several grounds. First, the majority accuses the district court of " 'rel[ying] heavily on an isolated comment' about balancing." Maj. Op. at 137 (quoting *Mendes–Silva v. United States,* 980 F.2d 1482, 1487 (D.C.Cir.1993)). The district court had no choice, however, given the lack of any other support (such as the studies and their data on which Goldman purported to rely), but to focus on Goldman's own characterization of his methodology—and, given the nature of his characterization, to reject the methodology.

The majority also observes that Goldman himself explained that he used the "traditional methodology of experts in the field." Maj. Op. at 137, 138–139. Indeed he so stated repeatedly—without ever identifying or describing the methodology except as noted above. If such conclusory statements must be accepted at face value, as the majority suggests, the *Daubert* standard becomes meaningless. *Cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1319 (9th Cir.) (*Daubert II*) (summarily dismissing "experts' unadorned assertions that the methodology they employed comports with standard scientific procedures"), *cert. denied,* —— U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995).

The majority similarly suggests that Goldman's "significant stature and expertise in the area of birth defects" shows that he "employed a scientifically valid methodology or mode of reasoning." Maj. Op. at 139–140. *Daubert,* however, requires that the expert's testimony in a specific case satisfy "a standard of evidentiary reliability," 509 U.S. at 590, 113 S.Ct. at 2795—the expert's general reputation does not meet that requirement. *Cf. Daubert II,* 43 F.3d at 1319 ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert,* that's not enough.").

The majority acknowledges the "resemblance" of Goldman's testimony to "that proffered in *Richardson* [*v.Richardson–Merrell, Inc.,* 857 F.2d 823, 832 (D.C.Cir.1988), *cert. denied,* 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989) ], which held inadmissible expert testimony alleging causation of a drug in a birth defects case." Maj. Op. at 138. I find both Goldman's and Strom's testimony strikingly similar to the expert's in *Richardson.* At issue in *Richardson* was whether "Bendectin," an anti-nausea drug ingested by Mrs. Richardson during her pregnancy, had caused her child's birth defects. This court upheld the trial court's ruling that the plaintiffs' expert's opinion "lacked 'a genuine basis, in or out of the record,' and that his 'theoretical speculations' could not sustain the Richardsons' burden of proving causation." 857 F.2d at 829 (quoting *Richardson v. Richardson–Merrell, Inc.,* 649 F.Supp. 799, 803 (D.D.C.1986)). In holding the expert's opinion inadmissible, we noted in particular that he had (1) "admitted that no one who has published work on Bendectin has concluded that there is a statistically significant association between Bendectin and limb defects of the type at issue in this case," (2) reached "a statistically significant result" "[o]nly by recalculating the data" from published studies, and (3) rejected studies that "had been published in peer-reviewed scientific journals," while he himself "neither published his recalculations nor offered them for peer review." *Id.* at 831. As is clear from the foregoing discussion, Goldman's and Strom's opinions are subject to the same sort of criticisms. Nevertheless, the majority at-

tempts to distinguish the two cases on several grounds.

First, the majority states: "Dr. Goldman never conceded that his methodology was not generally accepted in his field ..." Maj. Op. at 138.[3] Neither did the expert in *Richardson* and after *Daubert* it is clear that the methodology need not be generally accepted. *See Daubert,* 509 U.S. at 589, 113 S.Ct. at 2794–95 (rejecting "generally accepted" standard as "austere" and "absent from and incompatible with the Federal Rules of Evidence"). What the *Richardson* expert did was to "acknowledge[ ] the necessity of a statistically significant association between the drug and its effect in human populations," to "admit[ ] that no one who has published work on Bendectin has concluded that there is a statistically significant association between Bendectin and limb reduction defects of the type at issue in this case," and, apparently, to concede that "[o]nly by recalculating the data was [he] able to obtain what he deems a statistically significant result." 857 F.2d at 830–31. There is no dispute here (nor can there be) that some "significantly statistical association" is required between Depo–Provera and Teresa's particular birth defects. *See, e.g.,* App. 210 (Strom), 328 (Goldman). Further, as detailed above, each expert here conceded that no such association had been shown. *See supra* pp. 141–142.

The majority next asserts that "unlike in *Richardson,* there is no 'overwhelming body of contradictory epidemiological evidence to Dr. Goldman's conclusion.'" Maj. Op. at 138 (quoting 857 F.2d at 830). In *Richardson,* we affirmed our earlier observation, in *Ferebee v. Chevron Chem. Co.,* 736 F.2d 1529, 1534 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), "that

courts should be very reluctant to alter a jury's verdict when the causation issue is novel and '*stand[s] at the frontier of current medical and epidemiological inquiry*'" provided that "experts are willing to testify to causation in such situations and their methodology is sound." 857 F.2d at 832 (quoting *Ferebee,* 736 F.2d at 1534; alteration and emphasis by *Richardson* court). The court then noted: "The case before us, however, is not like *Ferebee.*" Nor is this one. While the contradictory evidence here may not be "overwhelming" as in *Richardson,* it is substantial. The "frontier" of the inquiry was crossed long ago and "the published results must be given their just due." *Id.* at 832. In any event, as *Richardson* observed, an expert's methodology must always be "sound" even on the "frontier." That was not the case here.

Finally, the majority claims that "unlike the doctor in *Richardson,* whose opinions were based on his own unreviewed recalculations of data gathered by others, 857 F.2d at 831, Dr. Goldman examined the relevant studies, noted their limitations, and followed a methodology accepted by teratologists to reach his conclusion." Maj. Op. at 138–139. While the witnesses here did not admit recalculating data,[4] neither did they identify the specific data on which they relied nor explain why their interpretations of the data differ from those in all of the published studies. In addition, neither expert ever described a specific methodology that can be reasonably characterized as "accepted."

In sum, the appellants' expert testimony here was very much like the unfounded testimony in *Richardson* and falls far short of *Daubert's* "scientifically valid" standard for admissibility. On remand, the district court

---

**3.** The majority asserts that this was "a point that the *Ambrosini I* court suggested was dispositive in *Richardson.*" Maj. Op. at 138. *Ambrosini I,* however, characterized *Richardson* as holding that the expert's testimony "was inadmissible under Rule 703 because he acknowledged that the *data* underlying his opinion was not of a type *reasonably relied on* by experts in the field." 966 F.2d at 1469 (emphasis added); *see Richardson,* 857 F.2d at 829 ("If of a type reasonably relied upon by experts in the particular field in forming

opinions or inferences upon the subject, the facts or data need not be admissible in evidence.").

**4.** When asked whether he recalculated statistics, Strom replied: "Generally if the data—if the calculations were in the paper, I preferred to take the calculations of the author. The only time we did calculations of our own, and there were some where we did, where we had questions we were looking at, the data were presented by the authors but they did not do the calculations." App. 224.

ordered the expert witnesses "to produce the articles and other data which have formed the basis of their opinions," App. 24, as suggested by the panel in *Ambrosini I*,[5] and conducted a lengthy hearing as part of the "preliminary assessment" required by *Daubert, see* 509 U.S. at 592–93, 113 S.Ct. at 2796–97. In the end, after the two experts discounted (or ignored) all of the published and peer-reviewed opinions, while offering no data supporting a positive statistically significant association, much less a causal relationship, between Depo–Provera and *the specific birth defects Teresa Ambrosini suffered,* the only "bases" left for the two experts' opinions were Strom's "totality of the data" and Goldman's "preponderance of an argument" standards. Based on these wispish methodologies, neither Strom nor Goldman could offer a reliable, scientific opinion on general causation.[6] Thus, the district court was required to hold their opinions inadmissible and this court has no rational alternative but to follow *Richardson* and *Daubert* and to affirm that holding.[7] Because the majority opts otherwise, I dissent.

---

**5.** The *Ambrosini I* panel stated:

> [T]he court could have required Dr. Strom and Dr. Goldman to disclose the bases for their opinions so that it could determine whether the opinions had an adequate foundation (i.e. whether they were based on information that experts in the field would reasonably rely on in determining whether a particular drug causes birth defects). Only then could the court determine whether the affidavits were admissible under Rule 703. A court must know the basis for an expert's opinion before it can determine that the basis is not of a type reasonably relied on by experts in the field.

966 F.2d at 1469.

**6.** Because there was no preliminary showing of general causation—by either expert—it is irrelevant whether Goldman adequately eliminated other possible causes, as the majority maintains, to establish specific causation. *See* Maj. Op. at 140. As the district court observed, Strom conceded he was not qualified to testify on the latter. *See* App. 31. Nor need we consider whether Strom's testimony "fit" the plaintiff's case, that is, in the words of rule 702, whether it would

"assist the trier of fact to understand the evidence or to determine a fact in issue,"—a proposition the district court rejected. *See* App. 31–33; *see also Daubert*, 509 U.S. at 591–92, 113 S.Ct. at 2796 ("study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark" but "evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

**7.** Whether or not the district court "conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder," as the majority asserts, Maj. Op. at 141, (and I do not so concede) we can and should, nonetheless, affirm the court's decision for the reasons I have given. *See Haddon v. Walters*, 43 F.3d 1488, 1491 ("[W]e may affirm on different grounds the judgment of a lower court if it is correct as a matter of law.") (internal quotation and citation omitted).