Carolyn D. GRAVES, et al., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 80–0337.

United States District Court,
District of Columbia.

May 12, 1981.

Lawrence M. Mann, Lynn E. Berry, Deborah Reiser Schulman, Washington, D. C., for plaintiffs.

Randall Hunt Norton, Washington, D. C., for plaintiff-intervenor, Fireman's Fund Ins. Co.

Charles Flynn, Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

This is an action under the Federal Tort Claims Act. Plaintiff claims that the Air Force was negligent in failing to provide a second exit in a mechanical room located in a dining hall building on the Bolling Air Force Base. As a consequence of this alleged negligence, plaintiff's husband died when, after an explosion, he was unable to escape.

The evidence adduced at the trial showed that the mechanical room at the Base houses, among other things, three so-called converters or boilers in which cold water is heated for use in kitchen and cafeteria operations by means of very high temperature water piped from a remote location. George Graves, Sr., an employee of Capital Boiler Works, Inc., was dispatched to this location together with several co-workers on August 22, 1978, to make repairs on one of the converters. More specifically, it had become necessary to replace a gasket between two of the converter's large metal components. An attempt was made to install a new, appropriate flexitallic gasket, but that gasket proved to be unsatisfactory. Another flexitallic gasket was unavailable and, in order to complete the repairs within the time required by the Air Force, asbestos gaskets were used instead, with the approval of the representative of the Air Force on the location. The first asbestos gasket also failed, apparently because it was too thin. Eventually, a second asbestos gasket was installed and, unlike the previous gaskets, it stopped the converter assembly from leaking.

At that juncture, Mr. Graves was designated to open the appropriate valves to bring the system into operating condition. He did so standing on a ladder somewhat to the left rear of the converter. When the valves were opened, normal pressure and heat in the system (400 pounds pressure per square inch at 400°F) had begun to build up, and a portion of the gasket blew out. Hot water and steam immediately began escaping through the opening and very quickly enveloped the entire room. Since the converter and hence the steam were located between Mr. Graves and the exit door, he had no option but to retreat toward the rear of the room. Expert testimony indicated that the steam reached him in that location in about 15 seconds. He remained in the area for approximately 3 to 5 minutes, ultimately crawling out through the steam to the exit. Mr. Graves sustained substantial second and third degree burns and died three weeks later.

As indicated, this action claims negligence by the Air Force in failing to provide an exit in that portion of the room occupied by Mr. Graves, and it further claims that this negligence was the proximate cause of his injuries and his death.

### I

While there is some overlap, plaintiff proceeds on the basis of two theories.

First, it is claimed that failure to install a second exit was a violation of specific safety regulations designed to protect a class of persons of which Mr. Graves was a member and, accordingly, *prima facie* evidence of negligence. *Elliott v. Michael James, Inc.,* 559 F.2d 759 (D.C. Cir. 1977); *Bowman v. Redding & Co.,* 449 F.2d 956 (D.C. Cir. 1971). Second, it is asserted that, in any event, in view of general standards for the construction of areas of the kind here involved, it was unreasonable of the Air Force not to have provided a second exit.

The District of Columbia Building Code requires that in boiler and furnace rooms "two unobstructed and accessible exits remote from each other shall be provided ...." See Chapter 6, Article 2, section 3–608 of the Building Code. There clearly was no compliance with this provision.[1] But the government argues that under Section 3–107 of the 1961 edition of the District of Columbia Building Code, the Code does not apply to premises owned by the United States, and that it is therefore not bound thereby. The problem with that argument is that the Air Force has in effect waived Section 107, Air Force Manual 88–15 providing that the engineering design of Air Force standards will "comply with the local building code to the maximum practical extent" (unless local standards are lower than Air Force standards). See also AFR 127–101 and Fire Protection Engineer Navdocks Design Manual 8. Thus, a *prima facie* case of negligence was made out on the basis of the rule of *Elliott* and *Bowman, supra.*

Even if the provisions of the District of Columbia Code are deemed not to be technically applicable to this Air Force installation, the result is the same. The parties submitted a number of building and safety codes to establish general industry standards, including the so-called Life Safety Code, the BOCA Code, the Uniform Building Code, and the Southern Standards Building Code. As a general matter, these various codes prohibit dead ends in excess of a depth of fifty feet, and they require more than one exit in locations where highly hazardous equipment is located.[2]

■ Thus, negligence was established and, indeed, the government's arguments come down less to a claim that this was not so than to a claim that the negligence and the violation did not constitute the proximate cause of the injury. In this regard, it is asserted that, although the distance between the farthest wall in the equipment room and the door was two or three feet over the required 50 feet, this would have made no difference, and further that a second exit on the second floor above the equipment room would not have helped Mr. Graves because he could not have reached that exit any more than he was able to reach the principal exit. The Court does not find these arguments to be persuasive.

■ The 50-foot requirement is the one most favorable to defendant. Other code provisions would have required far more stringent safety standards than that.[3] In

---

1. The only argument advanced by defendant with regard to this provision is that, because the "converter" was heated not by an open flame but by hot water coils, it is not a boiler. This argument is not well taken because (a) the D.C. Building Code makes no such distinction, (b) the definitions of "boiler" in the Southern Standard Building Code and the BOCA Basic Building Code (both conceded by defendant to be "major model building codes" and, therefore, reliable indicators of the accepted meaning of "boiler" in the industry) included equipment such as the converter involved in this case, and (c) the dangers attendant to the converter are at least as great as those presented by a traditional fuel-fired boiler. In any event, in accordance with the Court's order filed Octo-

ber 20, 1980, this argument must be deemed abandoned as a result of defendant's failure to include it in its trial brief.

2. The government contends that the standards applicable to high hazard areas do not apply here because there was no regular occupancy of the room but only occasional or incidental use by skilled workmen, but the Court is persuaded by the testimony of plaintiff's expert witness who stated that because a virtually endless supply of steam flows into the converter, the room is a high hazard area within the meaning of the codes.

3. The limit for dead ends in the BOCA Code is 20 feet, § 610.2.

98

order to effectuate the public purposes of these safety regulations, strict adherence to the code will be required and causation may be assumed. *See Elliott v. Michael James, Inc., supra*, 559 F.2d at 763–64; *Bowman v. Redding & Co., supra*, 449 F.2d at 964.

The argument with respect to the second exit is even more untenable. The upstairs room could have been reached only by a stairway which was neither marked nor obvious as leading to an outside area. Indeed, that stairway did not lead to an outside area at all but to the roof of the building. Defendant's own expert conceded that for this reason it did not qualify as an exit within the meaning of the building and safety regulations. Thus, the government's argument is essentially of a bootstrap variety: it concedes that there was no second exit but asserts that had there been such an exit, it would not have helped the deceased. One answer to that theory is that had the second exit been in the appropriate location—that is, truly "remote from the first exit"—it would have been where the deceased was trapped, and he would have escaped with little or no injury. The other answer is that the provision of a hypothetical exit on the second floor would not have satisfied the safety codes in any event because it was neither marked nor obvious nor remote in a realistic sense from the first exit.

The Court finds that the upstairs was not part of the equipment room and that within that room the Air Force unreasonably and negligently failed to provide a second exit. It follows that defendant's failure in that regard was the proximate cause of Mr. Graves' injury and death.[4]

## II

The government next claims contributory negligence and assumption of the risk.

In regard to contributory negligence, it is contended that by participating in the installation of an asbestos gasket when a flexitallic gasket was called for, Mr. Graves was himself negligent. But the decision with respect to the use of the asbestos gasket was made initially by Graves' superiors, and it was finally approved by one Donald L. Ball, Air Force service contracts manager and the Air Force supervisor on the spot, and by Col. Ferrer of the Air Force, who is apparently an engineer by profession.[5] In view of these circumstances, it simply cannot seriously be contended that Mr. Graves acted unreasonably, and hence negligently, in proceeding with the installation of a gasket which had been approved by all these supervisors and experts.

The government's assumption of risk argument appears to be based on two theories: first, that Graves assumed the risk of a defective gasket; and second, that he assumed the risk of the entire incident when he used the valves behind the converter rather than other valves directly in front.

The first of these contentions has already been dealt with under the rubric of contributory negligence. Moreover, in that respect, even if Mr. Graves may be charged with having assumed the risk of a leak in the gasket, he clearly did not assume the risk related to defendant's negligence—the failure to provide a second exit. As for his choice of valves, the most that can be said with the benefit of hindsight is that Graves conceivably might have been better off using the valves in front of the converter rather than in the rear. But in a significant sense, the valves in front of the converter presented an even greater risk, for they were closer to the gasket and, depend-

4. The testimony of decedent's physician supplies even further evidence of causation: the symmetrical burns sustained by decedent all around his body indicate that he was not hit by the initial impact of the explosion (which would have caused more severe and more limited injuries). Thus, decedent had the time necessary to reach the location where an exit should have

been placed, and it is likely that he would have been able to escape serious injury—perhaps all injury—had there been an appropriate second exit.

5. In addition, Mr. Ball had access to other trained Air Force personnel in making his decision to proceed with the asbestos gasket.

ing upon the location of the weak spot in that gasket, the hot water and steam could have incapacitated him immediately upon its failure rather than providing him with the possibility of a retreat into the rear of the room. In no way can his choice of the particular valves—assuming that he knew or should have known that other valves would have been as well suited for the procedure—be regarded as an assumption of risk.

For these reasons, the Court finds that defendant was negligent and that it has not presented any defenses which would avoid its liability.

## III

Under the law of the District of Columbia, if a tort results in death, two causes of action arise, one under the Survival Statute (12 D.C. Code § 101 (1978)), and the other under the Wrongful Death Act (16 D.C. Code § 2701 et seq. (1976)). Each of these causes of action has its own elements of damages. *Runyon v. District of Columbia*, 463 F.2d 1319, 1321 (D.C. Cir. 1972). In connection with the question of damages under these statutes, plaintiff proffered the deposition testimony of an expert witness; and defendant relied on its cross examination of that witness, contesting several elements of the expert's calculations.

■ Recovery under the Survival Statute is comprised of that which the deceased would have been able to recover had he lived. *Semler v. Psychiatric Institute of Washington, D.C., Inc.*, 575 F.2d 922, 925 (D.C. Cir. 1978). In this case, the parties agree that the hospital and medical expenses amount to approximately $89,789.31. In addition, plaintiff asserts, and the Court agrees, that the 1978 amendment to 12 D.C. Code § 101 which eliminated a previously-existing prohibition on damages for the decedent's pain and suffering reflects a legislative intent to allow such recovery. Plaintiff's evidence shows that Mr. Graves was

conscious and suffered a great deal of pain from second and third degree burns all around his body during the approximately three weeks he survived following the explosion. Under the facts of this case, and taking into account the testimony concerning Mr. Graves' condition prior to his death, the Court finds that $75,000 is fair and reasonable compensation for decedent's pain and suffering. Since all of Mr. Graves' earnings were used to pay taxes and to maintain himself and those entitled to recover under the Wrongful Death Act (see *Runyon v. District of Columbia, supra*, 463 F.2d at 1322), damages under the Survival Act in this case amount to the total of the above figures, that is, $164,789.31.

■ The computation of plaintiff's recovery under the Wrongful Death Act is somewhat more difficult. While the formula appears to be quite simple, *i.e.*, the annual share of the plaintiff in the deceased's earnings multiplied by the decedent's work life expectancy and discounted to present worth, plus the costs of decedent's funeral and last illness (*Runyon v. District of Columbia, supra*, 463 F.2d at 1322), there is considerable dispute concerning the assumptions and figures employed by plaintiff's expert in calculating the loss to plaintiff. In addition, the parties dispute the application of the decision in *Murray v. United States*, 405 F.2d 1361 (D.C. Cir. 1968) to the instant case.[6] A discussion of the areas of dispute follows.

■ First, a figure of eight percent was used by plaintiff's expert to determine what the annual increases in Mr. Graves' income and benefits would have been, on the theory that Mr. Graves had experienced an average annual increase in income of approximately 8.5 percent over eighteen years of employment. The government, on the other hand, contends the appropriate figure is six percent, the average annual

---

6. Two undisputed factors in the determination of the amount of damages are Graves' work life expectancy, 24.1 years, and his total life expectancy, 33.5 years. The parties also agree

that the sum of $4,148 represents appropriate compensation for the decedent's last illness and burial.

increase for craftsmen,[7] contending that the higher rate was unlikely to continue because it was essentially attributable to factors not likely to be repeated, such as advancement from apprentice to boilermaker and becoming a union member.

At the time of his death Mr. Graves was earning double the wages of the average boilermaker, and his projected earnings would be nearly three times the average by 1990 if the 8.5 percent figure were used. The Court agrees with the government that the evidence is insufficient to justify such a substantial deviation from the average rate of increase and that some of the factors contributing to the 8.5 percent rate were unusual and unlikely to be repeated. However, because of Graves' earning history, the Court will approve the use of a 6.5 percent rate of increase rather than the 6 percent proposed by the government.

Second, in order to arrive at the present value of future earnings, plaintiff's expert used a discount rate of 10.5 percent, while the government contends that the rate should be 12 percent or 13 percent, the rates for long term Treasury securities.[8] As plaintiff's expert pointed out, however, other economists would use a figure of 6 to 7 percent, and there is no guarantee that once securities purchased in today's market matured they could be replaced with securities yielding equivalent interest. Bearing in mind the various speculations and intangibles, the Court will use the 10.5 percent discount rate.

Third, in adjusting the total figure to compensate for taxes the plaintiff will have to pay on the income derived from the award in this case, it was assumed by plaintiff's expert that taxes would be assessed as if the income were received by one person. The government argues that the tax burden would be lower if it were assumed, as it contends it should be, that the income will be taxable income to four persons (Mr. Graves' widow and his three children). There is no evidence before the Court concerning the effect this would have on the witness's calculations, and the Court refuses to speculate as to what the tax rates of each individual might be.

Finally, the figure supplied by plaintiff as representing the value of the services lost to the family as a result of Mr. Graves' death is the present value of twelve hours per week at the minimum wage ($3.50 per hour plus five percent increase per year) for the full life expectancy period, a total of $35,542. The evidence shows that Mr. Graves tutored his 16 year old daughter, taught his sons his trade, cooked dinner, did grocery shopping for the family, and did all of the household and automobile repairs. Presumably, however, there would have come a point where Mr. Graves would have no longer been required to tutor his daughter and would have let experience take over as his sons' teacher. The Court finds plaintiff's estimate of the value of lost services to be excessive, and further finds that $7,500 is reasonable compensation for this loss.

In view of the foregoing, the Court finds that the damages under the Wrongful Death Act, including the annual share of plaintiff in the deceased's earnings (wages and benefits) multiplied by the decedent's work life expectancy and discounted to present worth, compensation for lost services and compensation for the decedent's last illness and funeral, amount to a total of $427,468.

## IV

■ The final issue in connection with relief is the application of the rule established in the case of *Murray v. United States*, 405 F.2d 1361 (D.C. Cir. 1968), that a judgment against a defendant must be reduced by one-half where the defendant is statutorily precluded from seeking contri-

---

7. Plaintiff's evidence shows that the total damages figure would be reduced by approximately ten percent if one were to assume a 6.5 percent annual increase in income rather than eight percent.

8. Plaintiff's evidence shows that the total damages figure would be reduced by approximately ten percent if one were to use a 12 percent discount rate rather than that of 10.5 percent.

bution from a joint tortfeasor. The policy underlying this equitable doctrine is that the defendant would be entitled to contribution from the joint tortfeasor but for the statutory scheme, and that for this reason he should not be held liable for the full amount of the damages. Of course, the application of the "*Murray* credit" presupposes the existence of a joint tortfeasor—in this case that Capitol Boilerworks, Inc. was negligent concurrently with defendant.

Defendant argues that Capitol was negligent in using an asbestos gasket and in failing to "machine" the flange against which the gasket was installed. Plaintiff asserts the following grounds for denial of the credit: (1) Capitol was not negligent; (2) defendant has waived this affirmative defense by failing to plead it and failing to raise it until pretrial, Fed.R.Civ.P. 8(c); (3) the trend of the law in the District of Columbia is to reject the doctrine, *Coleman v. Ceco Corp.*, 108 Washington Law Reporter 893 (Superior Court April 8, 1980); [9] and (4) application of the *Murray* credit in this case would work a gross inequity because the insurance carrier of Capitol, intervenor herein, is a subrogree of plaintiff as to any recovery in this action, and if the employer were found negligent, the result would be that the employer would have to pay nothing, the employer's carrier would lose nothing, and plaintiff would lose one-half of the recovery.

The Court has found that Graves was not contributorily negligent, and on similar reasoning it also finds that Capitol was not negligent.[10] Use of an asbestos gasket was not in itself unreasonable—the asbestos gasket used was designed to withstand pressure greater than that of the converter—and final authorization for use of the asbestos gasket came from qualified Air Force personnel. In addition, the government presented no evidence that Capitol acted negligently in failing to "machine" the flange against which the gasket was installed. Accordingly, the *Murray* credit does not apply to plaintiff's recovery in this case irrespective of any of the other considerations advanced.

For all of the above reasons, judgment in the amount of $592,257.31, plus of interest and costs, will be entered in favor of plaintiff in this action.

## V

[11] As a result of a claim filed by the surviving wife and children of George Graves under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*,[11] Fireman's Fund Insurance Company, the workmen's compensation carrier for Capitol, was ordered on April 11, 1979, to pay compensation, medical benefits, and death benefits to Graves' family for the losses complained of in this action. Fireman's Fund was granted leave to intervene herein, and it filed a complaint asserting that under the Longshoremen's and Harbor Worker's Compensation Act (33 U.S.C. § 933(b)) it is entitled to a lien interest in any recovery by plaintiff in the amount it has paid to or on behalf of plaintiff and decedent pursuant to said order, that is, $280,321.31.[12]

---

9. This decision is now on appeal before the District of Columbia Court of Appeals.

10. This finding makes it unnecessary for the Court to address the other three grounds asserted by plaintiff as bases for denial of the *Murray* credit. It should be noted that, were the Court free to do so, it would follow the doctrine enunciated in *Coleman v. Ceco Corp., supra,* and reject the *Murray* credit doctrine.

11. This federal statute is applicable to the District of Columbia (36 D.C. Code § 501).

12. The statute provides, in relevant part, that

[a]cceptance of such compensation under an award in a compensation order ... shall operate as an assignment to the [intervenor] of all right of the person entitled to compensation to recover damages against [defendant] unless such person shall commence an action against [defendant] within six months after such award.

In the latter event, as is the case here, the intervenor is entitled to a lien on the proceeds of such action. *Travelers Insurance Co. v. District of Columbia*, 382 A.2d 269 (D.C.App. 1978).

Although the government moved to dismiss the intervenor's complaint,[13] it conceded Fireman's Fund's right to intervene for the limited purpose of obtaining a lien on plaintiff's recovery. Plaintiff, the only party who actually stands to lose as a result of intervenor's claim, has disputed neither intervenor's right to such a lien [14] nor the amount claimed. Thus, intervenor's claim is taken as conceded, and intervenor's lien on plaintiff's recovery will be recognized in the Court's order.

13. The government's motion was denied in an order filed October 3, 1980.

14. Indeed, plaintiff conceded intervenor's right to a lien. Plaintiff's Pretrial Brief at 45.