**Lakeshia DYSON, personally and as Personal Representative for the Estate of Rico Monroe, Jr., Plaintiff,**

v.

**Joseph K. WINFIELD, M.D., Defendant.**

**Lakeshia Dyson, personally and as Personal Representative for the Estate of Rico Monroe, Jr., Plaintiff,**

v.

**Pharmacia & Upjohn, Inc., Defendant.**

Nos. C.A. 97–1665(RCL), C.A. 97–1666(RCL).

United States District Court, District of Columbia.

Sept. 21, 2000.

Robert A.W. Boraks, John Hugo Jamnback, Garvey, Schubert & Barer, Washington, DC, for plaintiff.

Denise Adams Hill, Karen Roberts Turner, Montedonico, Hamilton & Altman, P.C., Chevy Chase, MD, for defendant.

## MEMORANDUM AND ORDER

LAMBERTH, District Judge.

On July 23, 1997, Lakeshia Dyson, the plaintiff, filed a complaint against Dr. Joseph Winfield, alleging two counts of malpractice. The defendant now moves for exclusion of the plaintiff's expert testimony and for summary judgment. He supports his motion for summary judgement with several alternative arguments: (1) plaintiff has no evidence that Provera caused her son's injuries, (2) plaintiff has no evidence that defendant departed from the standard of care in prescribing Provera or failing to warn her of its risks, and (3) plaintiff has no evidence that defendant's substandard care, if any, caused her to have her son. The Court is not persuaded by any of the defendant's arguments, and therefore DENIES his motion for exclusion as well as his motion for summary judgment.

### BACKGROUND

This case arises from Lakeshia Dyson's use of Provera in September and October of 1992. Concerned that she was pregnant, Ms. Dyson went to see Dr. Joseph Winfield, her OB/GYN, on September 26, 1992. She explained to Dr. Winfield that she had had unprotected sex a week prior and that her period was now late. Dr. Winfield gave her a urine pregnancy test which he interpreted as negative. Dr. Winfield then prescribed Provera to Ms. Dyson with the goal of inducing her menstruation.

Ms. Dyson took the Provera and, not having her period, returned to Dr. Winfield's office on October 17, 1992. During the consultation, Dr. Winfield took a blood sample to make certain whether or not she was pregnant. Although Dr. Winfield denies it, Ms. Dyson and her mother, who accompanied her on this visit, assert that they were told by the doctor that Ms. Dyson was pregnant. In any event, as the blood test later revealed, Ms. Dyson was indeed pregnant. At no point during this consultation did Dr. Winfield warn the pa-

tient of the risks associated with taking Provera in the early stages of pregnancy.

After her consultation, Ms. Dyson never talked with Dr. Winfield again, choosing instead to continue her prenatal care with a different doctor. In February of 1993, when she was over five months pregnant, Ms. Dyson received a sonogram that revealed the possibility of a birth defect. After considering abortion as an option, she decided to carry her pregnancy to full term because she felt that the child was "a baby" and not "a fetus." Dyson Aff. at ¶ 9.

On May 15, 1993, Rico Monroe Jr. was born. Sadly, the child had numerous birth defects including, but not limited to, impairments of sight, hearing, ingestion, and intellect.[1] The child required intense medical care, both in and out of the hospital, throughout his entire life. On November 24, 1996, at an age of about 3 and a half years old, the child died.

### PROCEDURAL HISTORY

Basing her claims on the District of Columbia Wrongful Death statute, 16 D.C.Code § 2701, and Wrongful Survival statute, 12 D.C.Code § 101, Ms. Dyson instituted a suit against Dr. Winfield on July 23, 1997. She alleged two counts of malpractice, one on her own behalf and one on behalf of her deceased child. On January 21, 2000, after a long period of discovery, defendant filed the motions now before this Court.

### ANALYSIS

As a preliminary matter, the Court notes jurisdiction under 28 U.S.C. § 1332. All defendants are citizens of states other than the District of Columbia, where the plaintiff is a citizen. The amount in controversy exceeds $75,000 exclusive of interest and costs. In all matters requiring the application of substantive law, the law of the District of Columbia will govern. *See*

[1]. Specifically, the child was diagnosed with microcephalia, blindness, hearing impairedness, abnormal smallness, mental and physical developmental delays, severe muscular/skeletal anomalies, undescended testes, ambiguous genitalia, malformed cardio/pul-

*Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### I.  Standard for Summary Judgement

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To survive a motion for summary judgment, the nonmovant must make a "sufficient showing to establish the existence of an element essential to that party's case." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. A "sufficient showing" exists when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

### II.  Defendant's Motion to Exclude Plaintiff's Expert Testimony

In alleging liability, plaintiff relies on several experts. Defendant takes issue with two of these experts: Dr. Brian L. Strom and Dr. Robert F. Smith. In making his objection, defendant relies chiefly on *Daubert v. Merrell Dow Pharmaceuticals* and *Ambrosini v. Labarraque.* Also relying on these opinions, the Court disagrees with the defendant and finds the plaintiff's expert testimony admissible.

A.  The Admissibility of Expert Testimony under Rule 702, *Daubert* and *Ambrosini*

1.  Rule 702

The best place to start is almost always with the rule. Rule 702 states that

monary blood vessels, esophagial atresia, palate deformities, inability to ingest by mouth, simian creases, and "numerous other defects and malfunctions." See Plaintiff's compl at 3.

a "witness qualified as an expert by knowledge skill, experience, training, or education may testify" if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Although the provision is now a mainstay in determining the admissibility of expert evidence, it was not always that way. Prior to the rule's adoption, and indeed for many years afterward, the admissibility of expert testimony was determined under the *Frye* test. See *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *Frye* permitted expert testimony so long as the expert's methodology "was sufficiently established to have gained general acceptance" in the relevant scientific community. *Id.* at 1014. *Frye's* own "general acceptance," however, was displaced in an instant by *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

### 2. *Daubert v. Merrell Dow Pharmaceuticals*

In *Daubert*, the Supreme Court held that the *"Frye* test was superseded by the adoption of the Federal Rules of Evidence." *Daubert*, 509 U.S. at 587, 113 S.Ct. 2786. "A rigid 'general acceptance' standard," the Court opined "would be at odds with the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Id.* at 587, 113 S.Ct. 2786 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)).

In interpreting the requirements of Rule 702, the Court promulgated a two-pronged approach for evaluating the admissibility of expert testimony. The first prong, the "reliability" prong, focuses on evidentiary reliability and requires the district court to perform "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. In illustrating this prong, the Court went onto to suggest four factors that may be used in determining scientific validity: (1) whether the theory or technique "can be (and has been) tested," (2) whether the theory or technique has been "subjected to peer review and publication," (3) the method's "known or potential rate of error," and (4) whether the theory or technique finds "general acceptance" in the "relevant scientific community." *Id.* at 593–94, 113 S.Ct. 2786. The Court offered these factors cautiously, emphasizing that they did not comprise a "definitive checklist" because a Rule 702 inquiry is understood to be a "flexible one."[2] *Id.* at 594, 113 S.Ct. 2786.

The second prong of the *Daubert* approach is rather straightforward. Besides being reliable, evidence must be relevant. Basing its logic on the text of Rule 702 (evidence must "assist the trier of fact"), the Court explained that "[e]xpert testimony which ... is not relevant [is] ergo non-helpful." *Id.* at 591, 113 S.Ct. 2786 (quoting 3 Weinstein & Berger, paragraph 702[02], at 702–18).

### 3. *Ambrosini v. Labarraque*

Although the edicts of *Daubert* of course control this case, a discussion of *Ambrosini v. Labarraque*, 101 F.3d 129 (D.C.Cir. 1996) is especially warranted in this case. Besides being the leading case on expert testimony in this circuit, *Ambrosini* involved testimony by one of the same ex-

---

**2.** In the most recent Supreme Court case dealing with Rule 702, *Kumho Tire, Co. v. Carmichael,* the Court affirmed its commitment to a flexible approach:

> [T]he test of reliability is 'flexible' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to the ultimate reliability determination.
>
> *Kumho Tire, Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

perts seeking to testify in the instant case. Further, the underlying issue in *Ambrosini*, whether Depo–Provera caused birth defects in the plaintiff's child, is quite similar to the underlying issue in the case at hand. Thus, a short discussion of *Ambrosini* is in order.

In *Ambrosini*, Dr. Brian L. Strom intended to testify that Depo–Provera was "capable of causing the types of defects suffered by the plaintiff." *Id.* at 135. The defendant moved for the exclusion of this testimony on relevance grounds, asserting that the testimony failed to show that the drug *did in fact* cause the plaintiff's injuries, and therefore did not "fit" the needs of the jury in deciding the issue. The circuit court disagreed. It held Dr. Strom's testimony admissible because it "relate[d] to a contested issue and could aid the jury in the resolution" of the claim. The court explicitly rejected the notion that evidence should be excluded "simply because it fails to establish the causal link to a specified degree of certainty." *Id.* at 135. Rather, the court found the "dispositive question" to be "whether the testimony will assist the trier of fact. . . ." *Id.* at 135.

The court also addressed the scientific validity of Dr. Strom's methodology. Of note here is that the court found his lack of publications to be understandable, as there would be "no reason in the world" to publish a study because "Depo–Provera is no longer prescribed during pregnancy." *Id.* at 136.

Besides Dr. Strom, *Ambrosini* involved the testimony of an expert who sought to testify that Depo–Provera did in fact cause the alleged injuries. Although the expert relied on many "animal, pharmacological, and human studies," he could not cite any specific study to support his conclusion. Instead, "following the traditional methodology of experts in his field," the expert concluded that "there was significant data to conclude that progestins produced a significant malformation rate." *Id.* at 137. Finding the testimony admissible, the cir-

cuit court stated that "a cause-effect relationship need not be clearly established by . . . studies before [an expert] can testify that, in his or her opinion, such relationship exists." *Id.* at 138.

## B.  Dr. Strom's Testimony in the Instant Case

■  Viewing the testimony of Dr. Strom against the above precedent, this Court finds his testimony to be both reliable and relevant, rendering it admissible in the case at hand. Each aspect of his testimony will now be considered in turn.

### 1.  Reliability

Dr. Strom seeks to testify that Provera, the drug supposedly ingested by the plaintiff, is capable of causing a wide variety of birth defects. The defendant asserts that his scientific methodology is faulty for three main reasons: (1) his opinion was formed for the purpose of litigation, (2) his opinion has not been subjected to peer review, and (3) his opinion and the means used to form the opinion, are not generally accepted in the medical community. The Court finds none of these objections persuasive.

The first objection may be disposed of quite easily. Defendant argues that the Dr. Strom's opinion is suspect because it was formed in preparation for testimony in *Ambrosini v. Labarraque*. This is true. It is also true that the *Ambrosini* court had no objection to it at the time. Further, this Court sees no reason to question Dr. Strom's scientific integrity. Dr. Strom stated in his declaration that he has testified in over 25 matters since 1994, including "many cases where his opinion was not supportive of the party presenting the case." Declaration at 3. The context in which Dr. Strom formed his opinion may be great fodder for cross examination, but it is not that for a motion to exclude.

The defendant's second objection can also be disposed of easily. The defendant argues that Dr. Strom has failed to publish

his conclusions and subject them to peer review. As mentioned above, the *Ambrosini* court specifically addressed this issue, finding that "some scientifically valid studies may not be published because of 'too limited interest.'" *Ambrosini*, 101 F.3d at 137 (quoting *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786). The limited interest in Dr. Strom's opinion in *Ambrosini* and this case comes from the fact that Provera "is no longer prescribed during pregnancy" due to its "known effects on offspring when exposed in utero." *Id.* at 136–37. Repeating the *Ambrosini* court's declaration, "there would be 'no reason in the world' to publish his findings." *Id.* at 136.

Finally, the defendant asserts that Dr. Strom's opinion and the means used to form it are not generally accepted in the scientific community. First, his opinion in this case is essentially the same as his Ambrosini opinion. In both cases, Dr. Strom is of the opinion that "the studies establish a link [between Provera and] a variety of birth defects." Declaration of Strom at 3. As should be clear by now, the *Ambrosini* court accepted this opinion as satisfying the reliability prong of the *Daubert* test. Nonetheless, the defendants make much hay out of the fact that in 1992, the FDA approved the "deletion of warnings [from progestin packaging] that progestins may cause non-genital birth defects." Brief for Defendant at 21. Such an act by the FDA would seem to imply that Dr. Strom's opinion is not "generally accept[ed] in the relevant scientific community." *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786. While such an argument is initially appealing, a closer analysis reveals its faults. First, while the FDA's disagreement with Dr. Strom is notable, it is no more notable than it was in 1996, when the *Ambrosini* court accepted his testimony. And it is no more notable than it was in 1995, when a federal district court in Illinois accepted a similar opinion from Dr. Strom. *See Grismer v. The Upjohn Company*, 1995 WL 390053 (N.D.Ill.1995). Further, the FDA, the alleged bellwether of the scientific community, has itself agreed, then disagreed with the position of Dr. Strom. While the FDA is no doubt an organization rich with expertise, this is not a situation that suggests to the court that Dr. Strom, by his mere disagreement with their position, is therefore a mad scientist.

Regarding the scientific methodology employed by Dr. Strom, this Court has no objections. In forming his opinion, Dr. Strom reviewed "all the human studies that have been done on the teratogenicity of sex hormones, including progestins." Declaration of Strom at 3. In his declaration, he demonstrated this by critiquing many studies, both those supporting and detracting from his opinion. *Id.* at 4–7. There is no reason to think that this methodology, itself found acceptable to the *Ambrosini* court, is so devoid of the scientific method as to render it unreliable.

2. Relevance

The defendant asserts that Dr. Strom's testimony should be excluded because his testimony only shows that "Provera may cause some birth defects different from the ones suffered by [plaintiff's son]." Brief for Defendant at 18–19. Although this is a fair characterization of Dr. Strom's testimony, it is not grounds for exclusion. As the *Ambrosini* court stated, "evidence does not warrant exclusion simply because it fails to establish the causal link to a specified degree of probability." *Ambrosini*, 101 F.3d at 135. Rather "the dispositive question is whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786, and Fed.R.Evid. 702). Here, Dr. Strom's testimony can assist the trier of fact as it relates to one of the central issues of the case, whether Provera causes birth defects. The fact that this testimony, by itself, does not show that Provera caused the specific injuries of the plaintiff's son does not make it somehow irrelevant to the jury's consideration. To hold otherwise would be to hold that *all* expert testi-

mony must be independently dispositive on the issue for which it is offered, or else be excluded. The *Ambrosini* court specifically rejected this proposal, finding that, just because "Dr. Strom's testimony alone may be insufficient ... to survive summary judgment does not necessarily defeat its admissibility under the fitness prong of Daubert." *Ambrosini*, 101 F.3d at 136.

## C. Dr. Smith's Testimony

Dr. Robert L. Smith seeks to testify that "the birth defects noted in the deceased child ... were induced by his mother's ingestion of Provera during her very early pregnancy." Declaration of Smith at 2. The defendant opposes the admissibility of this testimony, asserting that Dr. Smith is unqualified to render a medical opinion in this case, and that his scientific methodology is unreliable. The Court disagrees on both counts.

■ It is true that Dr. Smith is not a physician. But that does not automatically render him ineligible to testify on scientific matters pertaining to the human body. Rather, the key to qualifying him as an expert is his knowledge, not his academic degree. *See Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167 (holding that non-scientifically trained witnesses, such as auto mechanics, may qualify as experts under Rule

702 and *Daubert*). Dr. Smith describes himself as a "neuroscientist specializing in the effects of chemical exposure during pregnancy on fetal development." Declaration of Smith at 1. His curriculum vitae confirms this assertion. He is a full professor at George Mason University and is a member of the Neurobehavioral Teratology Society.[3] Dr. Smith has published extensively on subjects similar to the one at hand in this case, and has been invited to present his findings just as often. He has received substantial funding from public and private organizations, and his work has been cited by numerous physicians and non-physicians in their own studies. In short, Dr. Smith is a firmly established member of the scientific community which studies birth defects and their causes. He is thus appropriately qualified to give testimony in this case.[4]

■ The defendant also objects to the methodology used by Dr. Smith in forming his opinion. In forming his opinion, Dr. Smith relied on the medical records in this case, numerous studies relevant to this matter, and his many years of personal experience on the subject.[5] After this research, Dr. Smith concluded that Provera is a teratogen, that there exists a biologically plausible mechanism by which Provera could cause the birth defects alleged in

---

3. A substance is teratogenic if it causes "developmental malformations." Webster's Ninth New Collegiate Dictionary 1216 (1990). Teratology is commonly understood as the study of the causes and prevention of human birth defects. See Brief for Plaintiff at 26.

4. Much of the defendant's objection to Dr. Smith's qualifications is predicated on his "diagnosis" of VACTERL in the plaintiff's son. "VACTERL" is a term used to describe the co-incidence of several specific birth defects in a patient. An infant with the requisite number and type of birth defects is considered to have VACTERL. The defendant asserts that, since Dr. Smith is not a physician, he is not qualified to diagnose someone with VACTERL. The Court disagrees with this argument. To "diagnose" an infant for VACTERL, one need only compare the physician's diagnoses of the individual birth defects to the list of defects encompassed by VACTERL.

Thus, a diagnosis of VACERTL can be made by anyone who can compare lists of medical data. Any degree of expertise needed to compare the lists is undoubtedly possessed by Dr. Smith. Further, as Dr. Smith explains in his declaration, his VACTERL-based opinion is tangential to his main opinion on the causes of the birth defects in this case. Declaration of Smith at 7–8.

5. Specifically, Dr. Smith stated: "In developing an opinion for this case, I have relied heavily upon my own background knowledge of biological signaling systems. I have also examined the medical records of [the plaintiff's son], read the opinions of several other experts testifying on this case, and conducted some specific literature searches to obtain recent articles of particular relevance. I have also drawn upon a wide variety of literature I was already aware of and materials I use in my teaching." Declaration of Smith at 2.

this case, and that there is no specific alternative causal explanation for the alleged birth defects. In commenting on his methodology, he further stated that his "analysis in this matter is consistent with conventional scientific methodology of deriving a thesis logically from confirming evidence in the absence of evidence negating the plausibility of the thesis." Declaration of Smith at 8. Given this methodology, the Court is unable to say that Dr. Smith's conclusions are not "ground[ed] in the methods and procedures of science." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Dr. Smith draws his opinion from a comprehensive review of the applicable literature, and elaborates on each step of his analysis. He also addresses studies that might seem to contradict his conclusion, stating why he believes he is still correct. Most persuasive to this Court, the *Ambrosini* court approved of methods which are strikingly similar to those used by Dr. Smith. Like the physician in *Ambrosini*, Dr. Smith also "identified [the] animal, pharmacological, and human studies that he relied on" and "follow[ed] the traditional methodology of experts in his field." *Ambrosini*, 101 F.3d at 137. Thus, Dr. Smith's procedures are not only well grounded in the scientific method, but also accepted by this circuit as meeting the first prong of *Daubert*.

\*    \*    \*    \*    \*    \*

The opinions of Drs. Strom and Smith, viewed under Rule 702, *Daubert* and *Ambrosini*, are thus admissible. The defendant's motion to exclude is therefore denied. The Court now considers the defendant's summary judgment motion.

### III. Defendant's Motion for Summary Judgment Based on Inadequate Evidence that Provera Caused the Injuries in Question

The defendant's assertion of inadequate evidence on this ground was predicated on the plaintiff's experts being excluded. As detailed above, the defendant's motion to exclude was denied, making the disposition of this motion therefore quite clear. Nonetheless, completeness demands a short explanation of the reasoning behind the decision.

The plaintiff's experts argue that Provera is capable of causing, and did in fact cause, birth defects in the plaintiff's child. As this testimony is admissible, the Court finds that there is a "genuine issue as to ... material fact." Fed.R.Civ.P. 56(c). Accordingly, defendant's motion for summary judgment on inadequate proof that Provera caused the birth defects in question is denied.

### IV. Defendant's Motion for Summary Judgment Based on Inadequate Evidence of Substandard Care

■ The plaintiff alleges that the defendant rendered substandard care to her in two ways: (1) he prescribed Provera to her while she was pregnant, and (2) he failed to inform her of the risks of prenatal exposure to Provera once he knew she was pregnant. The defendant argues that neither of these assertions are supported by evidence. The Court disagrees and denies the defendant's motion.

#### A. Evidence of Substandard Care in Prescribing Provera

To survive the defendant's motion, the plaintiff must offer evidence sufficient for a reasonable jury to conclude that prescribing Provera to the plaintiff was substandard care. The plaintiff, through the straightforward testimony of Dr. S. James Dispenza, has satisfied this burden. In response to a question about the appropriateness of the defendant's prescription, Dr. Dispenza stated "I think [the defendant's use of Provera] is an inappropriate use of a hormone in this patient." Deposition of S. James Dispenza at 37. Later, when probed as to why, Dr. Dispenza explained that the defendant, in using a urine pregnancy test, had failed to conclusively rule out pregnancy which would make Provera

an inappropriate prescription. The following excerpt illustrates this:

Q. [W]ithin a reasonable degree of medical certainty, ... [is it] your opinion that [the plaintiff's condition] required another type of test [besides the urine pregnancy test]?

A. Yes

Q. What test was that?

A. A blood pregnancy test.

Deposition of S. James Dispenza at 38.

It is of course likely that this testimony will be contradicted by the defendant's experts. But that is not the question for the Court. Rather, as long as the evidence is sufficient for a reasonable jury to find substandard care, summary judgment is inappropriate. Dr. Dispenza's testimony clearly meets this threshold.

B. Evidence of Substandard Care in Not Informing the Plaintiff of Provera's Risks

To survive the defendant's motion, the plaintiff must produce evidence sufficient for a reasonable jury to find the defendant deviated from the standard of care in not informing the plaintiff of Provera's risks. The plaintiff has satisfied this burden.

The defendant admits that he did not inform the plaintiff of Provera's risks, but claims that he is not at fault because she failed to return for a subsequent appointment at which he was planning to apprise her of the risks. Like the above issue, the testimony of Dr. Dispenza is dispositive on the matter. Regarding the plaintiff's October 17, 1992 visit, Dr. Dispenza was asked:

Q. Do you have an opinion one way or the other whether or not it is a deviation from the standard of care for Dr. Winfield at that October 17 visit, [to] fail[ ] to at least apprise [the patient] of the information contained in the [Physician's Desk Reference] warning box?

A. Yes

Q. What is that opinion?

A. That it is a deviation.

Deposition of Dr. S. James Dispenza at 61.

The defendant tries to advance his summary judgment motion by using another portion of Dr. Dispenza's testimony. Prior to the above statement, Dr. Dispenza testified that the defendant did not deviate from the standard of care in failing to warn the plaintiff when she failed to keep her appointment. Deposition of Dr. S. James Dispenza at 46–47. The defendant misapprehends Dr. Dispenza's testimony. Dr. Dispenza expressed two opinions on the defendant's failure to warn. First, according to Dr. Dispenza, the defendant deviated from the standard of care in failing to warn the plaintiff when she was in his office. Second, the defendant did not deviate from the standard of care in failing to warn to patient after she left his office. Thus, the plaintiff does have evidence that the defendant's failure to warn was substandard care. Accordingly, the defendant's summary judgment motion is denied.

V. Defendant's Motion for Summary Judgment Based on Inadequate Evidence that the Failure to Warn Caused the Child's Birth

To survive the defendant's motion, the plaintiff must offer sufficient evidence for a reasonable jury to conclude that she would have terminated her pregnancy if informed of Provera's risks. The plaintiff has met this burden. In her affidavit, she stated, "If [the defendant] had told me that there was any possibility that I could end up with a child with any sort of birth defects because of the Provera I took, I would have wanted to terminate the pregnancy." Dyson Aff. at ¶ 4.

The defendant rightly suggests that a pertinent issue here is whether a reasonable person would terminate a pregnancy after such a warning. See Canterbury v. Spence, 464 F.2d 772 (D.C.Cir.1972) (applying District of Columbia law). But the defendant is incorrect in asserting that the

plaintiff has not presented such evidence. As this jurisdiction's leading case on physician warnings put it,

> If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown.... The patient's testimony on that score is relevant....

Id. at 791. The plaintiff's affidavit supplies sufficient evidence for a jury to conclude that a reasonable person would have chosen to terminate the pregnancy when properly warned. The defendant's motion is thus denied.

### VI. Defendant's Motion for Dismissal of Plaintiff's Claim for Emotional Distress and Extraordinary Child Rearing Expenses

■ The plaintiff seeks compensation for her emotional distress and child rearing expenses. The defendant argues that such claims are not recoverable under the District of Columbia's Wrongful Death and Survival statutes. See 12 D.C.Code § 101 (1967); 16 D.C.Code § 2701 (1967). For the following reasons, the Court grants the defendant's motion to dismiss these claims.

In the District of Columbia, "if a tort results in death, two causes of action arise, one under the Survival Statute and the other under the Wrongful Death Act." *Graves v. U.S.*, 517 F.Supp. 95, 99 (D.D.C. 1981) (citations omitted). "Each of these causes of action has its own elements of damages." *Id.* (citing *Runyon v. District of Columbia*, 463 F.2d 1319, 1321 (D.C.Cir. 1972)). The Survival statute permits recovery for what the "deceased would have been able to recover had he lived." *Graves*, 517 F.Supp. at 99. The Wrongful Death Act permits a deceased's guardian or next of kin to recover for the financial loss caused to that party by the death. The claimant may recover for personal financial losses including the "reasonable expenses of last illness and burial." § 16–2701. However, a claimant "may not be

compensated for [its] grief." *Runyon*, 463 F.2d at 1322. *See also Hughes v. Pender*, 391 A.2d 259 261 n. 2 (D.C.1978).

The above law makes it clear that the plaintiff may not recover for emotional distress. A slightly more difficult issue is presented, however, by her claim for child rearing expenses. It might be argued that, since her child was born with chronic birth defects which eventually led to his death, the defects lasting his whole life would constitute his "last illness" and thus permit recovery for care during this period. The Court is not convinced that such an extended interpretation is consistent with wrongful death statutory scheme. As Washington D.C.'s highest court has recognized, the Wrongful Death Act is a "derogation[ ] from the common law" and therefore must be "strictly construed." *Waldon v. Covington*, 415 A.2d 1070, 1076 n. 17 (D.C.1980) (citing *Pitts v. District of Columbia*, 391 A.2d 803, 807 (D.C.1978)). The Court thus grants the defendant's motion for dismissal of the plaintiff's claims for extraordinary child rearing expenses.

### VII. Defendant's Motion for Dismissal of the Plaintiff's Punitive Damages Claim

The Court is unable to understand the defendant's motion regarding punitive damages. A careful reading of the plaintiff's complaint reveals no claim for punitive damages. Thus, the defendant's motion is denied.

### VIII. Defendant's Motion for Summary Judgment based of Proximate Cause and Adequacy of Warnings

This motion for summary judgment was originally filed by Dr. Winfield's co-defendant, Pharmacia & Upjohn, Inc. Dr. Winfield joined in this motion on January 11, 2000. Similar to the defendant's motion regarding punitive damages, the Court is perplexed as to the defendant's reasoning in the instant motion. The motion submitted by Pharmacia & Upjohn argues that Provera's labeling was not inadequate, and

even if it was, the inadequacy did not cause the plaintiff's damages. Defendant Winfield is being sued for prescribing Provera to a pregnant woman and failing to warn her of the drug's risks. Given these claims, Pharmacia and Upjohn's motion fails to assist defendant Winfield in any way. Accordingly, the defendant's motion is denied.

## CONCLUSION

In the case of Dyson v. Winfield, Civil Action No. 97–1665, it is hereby

ORDERED that the defendant's motion to exclude [35–1] be DENIED; further, it is

ORDERED that the defendant's motion for summary judgment [60–1] be DENIED; further, it is

ORDERED that the defendant's motion to dismiss the plaintiff's claim for emotional distress and extraordinary child rearing expenses [57–1] be GRANTED; further, it is

ORDERED that the defendant's motion to dismiss the plaintiff's punitive damage claim [61–1] be DENIED; further, it is

ORDERED that the defendant's motion for summary judgment based on proximate cause and adequacy of warnings [59–1] be DENIED; further, the clerk is

ORDERED to correct the docket by deleting the defendant's joinder with Pharmacia & Upjohn in Pharmacia & Upjohn's motion for summary judgment on the fraud and breach of warranty counts [58–1]; further, the clerk is

ORDERED to correct the docket by adding the defendant's joinder with Pharmacia & Upjohn in Pharmacia & Upjohn's motion to dismiss the plaintiff's claim for punitive damages [61–1]; further, the clerk is

ORDERED to correct the docket by adding the defendant's joinder with Pharmacia & Upjohn in Pharmacia & Upjohn's

motion to exclude the plaintiff's expert testimony [35–1].

SO ORDERED.